IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

Shelley Lee Hodge,          )     Civil Action No. 8:15-cv-00440-JMC-JDA
                   )
        Plaintiff,   )    **REPORT AND RECOMMENDATION**
                   )    **OF MAGISTRATE JUDGE**
   vs.             )
                   )
Carolyn W. Colvin,       )
Commissioner of Social Security, )
                   )
        Defendant.  )

      This matter is before the Court for a Report and Recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., and Title 28 U.S.C. § 636(b)(1)(B).[1]  Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Commissioner of Social Security ("the Commissioner"), denying Plaintiff's claims for disability insurance benefits ("DIB") and supplemental security income ("SSI").[2] For the reasons set forth below, it is recommended that the decision of the Commissioner be reversed and remanded for administrative action consistent with this recommendation, pursuant to sentence four of 42 U.S.C. § 405(g).

---

    [1]A Report and Recommendation is being filed in this case, in which one or both parties declined to consent to disposition by a magistrate judge.

    [2]Section 1383(c)(3) provides, "The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title."  42 U.S.C. § 1383(c)(3).

## PROCEDURAL HISTORY

On February 3, 2012, Plaintiff filed applications for DIB and SSI, alleging disability beginning October 4, 2011. [R. 192–200.]   The claims were denied initially and upon reconsideration by the Social Security Administration ("the Administration"). [R. 54–71, 76–97.] Plaintiff filed a request for hearing before an administrative law judge ("ALJ"), and on September 5, 2013, ALJ Eric Eklund conducted a video hearing on Plaintiff's claims, with Plaintiff appearing in Greenville, South Carolina and the ALJ presiding from Lawrence, Massachusetts.  [R. 16–53.]

On September 25, 2013, the ALJ issued his decision finding Plaintiff was disabled under the Social Security Act ("the Act") from October 4, 2011, through May 1, 2013, with her disability ending May 2, 2013.  [R. 108–24.] At Step 1[3], the ALJ found Plaintiff last met the insured status requirements of the Act on December 31, 2015, and had not engaged in substantial gainful activity since October 4, 2011, the date the claimant became disabled.  [R. 112, Findings 1 & 2.]  At Step 2, the ALJ found that, from October 4, 2011, through May 1, 2013, the period during which Plaintiff was under a disability, the Plaintiff had the following severe impairments: Depression; Anxiety; Posttraumatic Stress Disorder. [R. 112, Finding 3.]

At Step 3, the ALJ determined that, from October 4, 2011, through May 1, 2013, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1.

---

[3]The five-step sequential analysis used to evaluate disability claims is discussed in the Applicable Law section, *infra*.

[R. 112–13, Finding 4.]  The ALJ specifically considered Listings 12.04 and 12.06 with respect to Plaintiff's mental impairment. [*Id.*]

Before addressing Step 4, Plaintiff's ability to perform her past relevant work, the ALJ found that Plaintiff retained the following residual functional capacity ("RFC") from October 4, 2011, through May 1, 2013:

> After careful consideration of the entire record, I find that, from October 4, 2011 through May 1, 2013, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant is limited to simple, unskilled work; the claimant can only work in low-stress jobs defined as only occasional decision-making and only occasional changes in the work setting; the claimant can have no interaction with the public; only occasional interaction with coworkers and no tandem tasks; due to mental impairments, the claimant is unable to engage in sustained work activity for a full 8-hour workday on a regular and consistent basis and would miss more than 3 days of work per month and be off task up to 30% of the workday.

[R. 113–16, Finding 5.]  Based on this RFC, at Step 4, the ALJ determined Plaintiff was unable to perform her past relevant work as a licensed practical nurse, office nurse, school nurse, and a retail sales clerk.  [R. 116, Finding 6.]  In light of Plaintiff's age, education, work experience, and residual functional capacity, the ALJ determined that, from October 4, 2011, through May 1, 2013, there were no jobs that existed in significant numbers in the national economy that the Plaintiff could have performed.  [R.117, Finding 10.]  Thus, the ALJ found that Plaintiff was under a disability, as defined by the Act, from October 4, 2011, through May 1, 2013.  [R. 117, Finding 11.]

With respect to the time period after May 1, 2013, the ALJ determined that, at Step 2, Plaintiff had not developed any new impairment or impairments since May 2, 2013, and

3

her current severe impairments were the same as those present from October 4, 2011, through May 1, 2013.  [R. 118, Finding 13.]  At Step 3, the ALJ determined that, beginning May 2, 2013, the Plaintiff had not had an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.  [R. 118, Finding 14.]  The ALJ found that Plaintiff experienced medical improvement as of May 2, 2013, the date her disability ended, and that the medical improvement that occurred was related to Plaintiff's ability to work because there had been an increase in Plaintiff's residual functional capacity.  [R. 118, Findings 15 &16.]

Before addressing Step 4, Plaintiff's ability to perform her past relevant work, the ALJ found that Plaintiff retained the following residual functional capacity ("RFC") beginning May 2, 2013:

> After careful consideration of the entire record, I find that, beginning May 2, 2013, the claimant has had the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant is limited to simple, unskilled work; the claimant can only work in low-stress jobs defined as only occasional decision-making and only occasional changes in the work setting; the claimant can have no interaction with the public; only occasional interaction with coworkers and no tandem tasks.

[R. 119, Finding 17.]

Based on this RFC, at Step 4, the ALJ determined Plaintiff was still unable to perform her past relevant work.  [R. 123, Finding 18.]  Considering Plaintiff's age, education, work experience, residual functional capacity, and the testimony of a vocational expert, the ALJ determined that there were jobs that existed in significant numbers in the national economy that the Plaintiff could have performed beginning May 2, 2013.  [R. 123,

Finding 22.]  Accordingly, the ALJ found that Plaintiff's disability ended on May 2, 2013. [R. 124, Finding 23.]

Plaintiff filed a request for review of the ALJ's decision with the Appeals Council, which denied review on December 4, 2014.  [R. 1–6.]  Plaintiff commenced an action for judicial review in this Court on January 29, 2015.  [Doc. 1.]

## THE PARTIES' POSITIONS

Plaintiff contends the ALJ's decision is not supported by substantial evidence and contains multiple legal errors warranting the reversal and remand of the case.  [*See* Doc. 9.]  Specifically, Plaintiff contends the ALJ

1.  failed to consider all of the available evidence when determining that Plaintiff was not disabled after May 1, 2013 [*id.* at 12–13];

2.  erred by refusing to assign any weight to the opinions of Plaintiff's treating physicians after May 1, 2013, and his evaluation of the medical opinion evidence was not supported by substantial evidence  [*id.* at 14–15; Doc. 11 at 3–4]; and

3.  failed to make a proper credibility determination for the time period after May 1, 2013, as required by SSR 97-7p  [Doc. 9 at 15–16].

The Commissioner contends the ALJ's decision should be affirmed because there is substantial evidence of record that Plaintiff was not disabled within the meaning of the Act after May 1, 2013.  [*See* Doc. 10.]  Specifically, the Commissioner contends the ALJ

1.  properly considered all of the available evidence when determining that Plaintiff was not disabled after May 1, 2013 [*id.* at 9–12];

2.  properly weighed the opinions of Plaintiff's treating psychiatrist Dr. Menendez-Caldwell [*id*. at 12–15]; and,

3.  properly assessed Plaintiff's credibility in accordance with the regulations [*id*. at 16–18].

5

## STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citing *Woolridge v. Celebrezze*, 214 F. Supp. 686, 687 (S.D.W. Va. 1963)) ("Substantial evidence, it has been held, is evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'").

Where conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)," not on the reviewing court.  *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *see also Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision).  Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence.

6

*See Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012); *Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962).

The reviewing court will reverse the Commissioner's decision on plenary review, however, if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980); *see also Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994). Where the Commissioner's decision "is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the [Commissioner's] decision 'with or without remanding the cause for a rehearing.'" *Vitek v. Finch*, 438 F.2d 1157, 1158 (4th Cir. 1971) (quoting 42 U.S.C. § 405(g)). Remand is unnecessary where "the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose." *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974).

The court may remand a case to the Commissioner for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g). *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir. 1991) (unpublished table decision). To remand under sentence four, the reviewing court must find either that the Commissioner's decision is not supported by substantial evidence or that the Commissioner incorrectly applied the law relevant to the disability claim. *See, e.g.*, *Jackson v. Chater*, 99 F.3d 1086, 1090–91 (11th Cir. 1996) (holding remand was appropriate where the ALJ failed to develop a full and fair record of the claimant's residual functional capacity); *Brehem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (holding remand was appropriate where record was insufficient to affirm but was also insufficient for court

7

to find the claimant disabled). Where the court cannot discern the basis for the Commissioner's decision, a remand under sentence four is usually the proper course to allow the Commissioner to explain the basis for the decision or for additional investigation. *See Radford v. Comm'r*, 734 F.3d 288, 295 (4th Cir. 2013) (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985);*see also Smith v. Heckler*, 782 F.2d 1176, 1181–82 (4th Cir. 1986) (remanding case where decision of ALJ contained "a gap in its reasoning" because ALJ did not say he was discounting testimony or why); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (remanding case where neither the ALJ nor the Appeals Council indicated the weight given to relevant evidence). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *See Smith*, 782 F.2d at 1182 ("The [Commissioner] and the claimant may produce further evidence on remand."). After a remand under sentence four, the court enters a final and immediately appealable judgment and then loses jurisdiction. *Sargent*, 941 F.2d 1207 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 102 (1991)).

In contrast, sentence six provides:

> The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g). A reviewing court may remand a case to the Commissioner on the basis of new evidence only if four prerequisites are met: (1) the evidence is relevant to the determination of disability at the time the application was first filed; (2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there is good cause for the claimant's

8

failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant made at least a general showing of the nature of the new evidence to the reviewing court. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citing 42 U.S.C. § 405(g); *Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir. 1983); *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)), *superseded by amendment to statute*, 42 U.S.C. § 405(g), *as recognized in Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991).[4]  With remand under sentence six, the parties must return to the court after remand to file modified findings of fact. *Melkonyan*, 501 U.S. at 98.  The reviewing court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings.  *See Allen v. Chater*, 67 F.3d 293 (4th Cir. 1995) (unpublished table decision) (holding that an order remanding a claim for Social Security benefits pursuant to sentence six of 42 U.S.C. § 405(g) is not a final order).

## APPLICABLE LAW

---

[4]Though the court in *Wilkins* indicated in a parenthetical that the four-part test set forth in *Borders* had been superseded by an amendment to 42 U.S.C. § 405(g), courts in the Fourth Circuit have continued to cite the requirements outlined in *Borders* when evaluating a claim for remand based on new evidence.  *See, e.g.*, *Brooks v. Astrue*, No. 6:10-cv-152, 2010 WL 5478648, at *8 (D.S.C. Nov. 23, 2010); *Ashton v. Astrue*, No. TMD 09-1107, 2010 WL 3199345, at *3 (D. Md. Aug. 12, 2010); *Washington v. Comm'r of Soc. Sec.*, No. 2:08-cv-93, 2009 WL 86737, at *5 (E.D. Va. Jan. 13, 2009); *Brock v. Sec'y of Health & Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992).  Further, the Supreme Court of the United States has not suggested *Borders*' construction of § 405(g) is incorrect.  *See Sullivan v. Finkelstein*, 496 U.S. 617, 626 n.6 (1990).  Accordingly, the Court will apply the more stringent *Borders* inquiry.

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a disability.  42 U.S.C. § 423(a).  "Disability" is defined as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 consecutive months.

*Id.* § 423(d)(1)(A).

## I.    The Five Step Evaluation

To facilitate uniform and efficient processing of disability claims, federal regulations have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (noting a "need for efficiency" in considering disability claims).  The ALJ must consider whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment.  20 C.F.R. §§ 404.1520, 416.920.  Through the fourth step, the burden of production and proof is on the claimant.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).  The claimant must prove disability on or before the last day of her insured status to receive disability benefits.  *Everett v. Sec'y of Health, Educ. & Welfare*, 412 F.2d 842, 843 (4th Cir. 1969).  If the inquiry reaches step five, the burden shifts to the Commissioner to produce evidence that other jobs exist in the

10

national economy that the claimant can perform, considering the claimant's age, education, and work experience. *Grant*, 699 F.2d at 191. If at any step of the evaluation the ALJ can find an individual is disabled or not disabled, further inquiry is unnecessary. 20 C.F.R. §§ 404.1520(a), 416.920(a)(4); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

### A. *Substantial Gainful Activity*

"Substantial gainful activity" must be both substantial—involves doing significant physical or mental activities, 20 C.F.R. §§ 404.1572(a), 416.972(a)—and gainful—done for pay or profit, whether or not a profit is realized, *id.* §§ 404.1572(b), 416.972(b). If an individual has earnings from employment or self-employment above a specific level set out in the regulations, he is generally presumed to be able to engage in substantial gainful activity. *Id.* §§ 404.1574–.1575, 416.974–.975.

### B. *Severe Impairment*

An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. *See id.* §§ 404.1521, 416.921. When determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments. 42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G). The ALJ must evaluate a disability claimant as a whole person and not in the abstract, having several hypothetical and isolated illnesses. *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989) (stating that, when evaluating the effect of a number of impairments on a disability claimant, "the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them"). Accordingly, the ALJ must

11

make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *Id.* at 50 ("As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments.").  If the ALJ finds a combination of impairments to be severe, "the combined impact of the impairments shall be considered throughout the disability determination process."  42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

## C.     *Meets or Equals an Impairment Listed in the Listings of Impairments*

If a claimant's impairment or combination of impairments meets or medically equals the criteria of a listing found at 20 C.F.R. Pt. 404, Subpt. P, App.1 and meets the duration requirement found at 20 C.F.R. §§ 404.1509 or 416.909, the ALJ will find the claimant disabled without considering the claimant's age, education, and work experience.[5]  20 C.F.R. §§ 404.1520(d), 416.920(a)(4)(iii), (d).

## D.     *Past Relevant Work*

The assessment of a claimant's ability to perform past relevant work "reflect[s] the statute's focus on the functional capacity retained by the claimant."  *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995).  At this step of the evaluation, the ALJ compares the claimant's residual functional capacity[6] with the physical and mental demands of the kind

---

[5]The Listing of Impairments is applicable to SSI claims pursuant to 20 C.F.R. §§ 416.911, 416.925.

[6]Residual functional capacity is "the most [a claimant] can still do despite [his] limitations."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

12

of work he has done in the past to determine whether the claimant has the residual functional capacity to do his past work.  20 C.F.R. §§ 404.1560(b), 416.960(b).

### E.     *Other Work*

As previously stated, once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *See* 20 C.F.R. §§ 404.1520(f)–(g), 416.920(f)–(g); *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992).  To meet this burden, the Commissioner may sometimes rely exclusively on the Medical-Vocational Guidelines (the "grids").  Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant nonexertional factors.[7]  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e); *Gory v. Schweiker*, 712 F.2d 929, 930–31 (4th Cir. 1983) (stating that exclusive reliance on the grids is appropriate in cases involving exertional limitations).  When a claimant suffers from both exertional and nonexertional limitations, the grids may serve only as guidelines.  *Gory*, 712 F.2d at 931.  In such a case, the Commissioner must use a vocational expert to establish the claimant's ability to perform other work.  20 C.F.R. §§ 404.1569a, 416.969a; *see Walker*, 889 F.2d at 49–50 ("Because we have found that the grids cannot be relied upon to show conclusively that

---

[7]An exertional limitation is one that affects the claimant's ability to meet the strength requirements of jobs. 20 C.F.R. §§ 404.1569a(a), 416.969a(a).  A nonexertional limitation is one that affects the ability to meet the demands of the job other than the strength demands.  *Id.*  Examples of nonexertional limitations include but are not limited to difficulty functioning because of being nervous, anxious, or depressed; difficulty maintaining attention or concentrating; difficulty understanding or remembering detailed instructions; difficulty seeing or hearing.  20 C.F.R. §§ 404.1569a(c)(1), 416.969a(c)(1).

13

claimant is not disabled, when the case is remanded it will be incumbent upon the [Commissioner] to prove by expert vocational testimony that despite the combination of exertional and nonexertional impairments, the claimant retains the ability to perform specific jobs which exist in the national economy.").  The purpose of using a vocational expert is "to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform."  *Walker*, 889 F.2d at 50.  For the vocational expert's testimony to be relevant, "it must be based upon a consideration of all other evidence in the record, . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments."  *Id.* (citations omitted).

## II.     Developing the Record

The ALJ has a duty to fully and fairly develop the record.  *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).  The ALJ is required to inquire fully into each relevant issue.  *Snyder*, 307 F.2d at 520.  The performance of this duty is particularly important when a claimant appears without counsel.  *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir. 1980).  In such circumstances, "the ALJ should scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, . . . being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Id.* (internal quotations and citations omitted).

## III.    Treating Physicians

If a treating physician's opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic

14

techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). The ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, i.e., when the treating physician's opinion does not warrant controlling weight, *Craig*, 76 F.3d at 590, but the ALJ must nevertheless assign a weight to the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) nature and extent of the treatment relationship; 3) supportability of the opinion; 4) consistency of the opinion with the record a whole; 5) specialization of the physician; and 6) other factors which tend to support or contradict the opinion, 20 C.F.R. §§ 404.1527(c), 416.927(c). Similarly, where a treating physician has merely made conclusory statements, the ALJ may afford the opinion such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Craig*, 76 F.3d at 590 (holding there was sufficient evidence for the ALJ to reject the treating physician's conclusory opinion where the record contained contradictory evidence).

In any instance, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983) (stating that treating physician's opinion must be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition for a prolonged period of time"); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). An ALJ determination coming down on the side of a non-examining, non-treating physician's

opinion can stand only if the medical testimony of examining and treating physicians goes both ways. *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986). Further, the ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. 20 C.F.R. §§ 404.1527(d), 416.927(d). However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. *Id.*

## IV.    Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. §§ 404.1517, 416.917; *see also Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986). The regulations are clear: a consultative examination is not required when there is sufficient medical evidence to make a determination on a claimant's disability. 20 C.F.R. §§ 404.1517, 416.917. Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary. *Id.*

## V.    Pain

Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment that could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). In evaluating claims of disabling pain, the ALJ must proceed in a two-part analysis. *Morgan v. Barnhart,* 142 F. App'x 716,

16

723 (4th Cir. 2005) (unpublished opinion).  First, "the ALJ must determine whether the claimant has produced medical evidence of a 'medically determinable impairment which could reasonably be expected to produce . . . the actual pain, in the amount and degree, alleged by the claimant.'"  *Id.* (quoting *Craig*, 76 F.3d at 594).  Second, "if, and only if, the ALJ finds that the claimant has produced such evidence, the ALJ must then determine, as a matter of fact, whether the claimant's underlying impairment *actually* causes her alleged pain."  *Id.* (emphasis in original) (citing *Craig*, 76 F.3d at 595).

Under the "pain rule" applicable within the United States Court of Appeals for the Fourth Circuit, it is well established that "subjective complaints of pain and physical discomfort could give rise to a finding of total disability, even when those complaints [a]re not supported fully by objective observable signs."  *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987) (citing *Hicks v. Heckler*, 756 F.2d 1022, 1023 (4th Cir. 1985)).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. §§ 404.1528, 416.928.  Indeed, the Fourth Circuit has rejected a rule which would require the claimant to demonstrate objective evidence of the pain itself, *Jenkins v. Sullivan*, 906 F.2d 107, 108 (4th Cir. 1990), and ordered the Commissioner to promulgate and distribute to all administrative law judges within the circuit a policy stating Fourth Circuit law on the subject of pain as a disabling condition, *Hyatt v. Sullivan*, 899 F.2d 329, 336–37 (4th Cir. 1990).  The Commissioner thereafter issued the following "Policy Interpretation Ruling":

> This Ruling supersedes, only in states within the Fourth Circuit (North Carolina, South Carolina, Maryland, Virginia and West Virginia), Social Security Ruling (SSR) 88-13, Titles II and XVI: Evaluation of Pain and Other Symptoms:
>
> ...
>
> **FOURTH CIRCUIT STANDARD:** Once an underlying physical or [m]ental impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence. If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree can, by itself, support a finding of disability. Objective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available, should be obtained and considered. Because pain is not readily susceptible of objective proof, however, the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative.

SSR 90-1p, 55 Fed. Reg. 31,898-02, at 31,899 (Aug. 6, 1990). SSR 90-1p has since been superseded by SSR 96-7p, which is consistent with SSR 90-1p. *See* SSR 96-7p, 61 Fed. Reg. 34,483-01 (July 2, 1996). SSR 96-7p provides, "If an individual's statements about pain or other symptoms are not substantiated by the objective medical evidence, the adjudicator must consider all of the evidence in the case record, including any statements by the individual and other persons concerning the individual's symptoms." *Id.* at 34,485; *see also* 20 C.F.R. §§ 404.1529(c)(1)–(c)(2), 416.929(c)(1)–(c)(2) (outlining evaluation of pain).

## VI.    Credibility

The ALJ must make a credibility determination based upon all the evidence in the record.  Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985).  Although credibility determinations are generally left to the ALJ's discretion, such determinations should not be sustained if they are based on improper criteria.  *Breeden*, 493 F.2d at 1010 ("We recognize that the administrative law judge has the unique advantage of having heard the testimony firsthand, and ordinarily we may not disturb credibility findings that are based on a witness's demeanor.  But administrative findings based on oral testimony are not sacrosanct, and if it appears that credibility determinations are based on improper or irrational criteria they cannot be sustained.").

## APPLICATION AND ANALYSIS

**Consideration and Weighing of Medical Opinion Evidence**

Plaintiff argues the ALJ failed to consider all of the available evidence when determining that Plaintiff was not disabled after May 1, 2013.  [Doc. 9 at 12–13.]  Specifically, Plaintiff argues the ALJ erred in finding Dr. Menendez-Caldwell's August 2013 opinion unconvincing and concluding that Plaintiff's symptoms were related to her being overwhelmed by the legal process rather than by her underlying PTSD and depression.  [*Id*. at 13.] Plaintiff argues the ALJ improperly gave little weight to Dr. Menendez-Caldwell's opinion and did not perform the analysis required by 20 C.F.R. § 404.1527(d) but stated only that the dramatic deterioration was not supported by the evidence of record.  [*Id*. at 15.]  Additionally, Plaintiff argues the ALJ refused to assign any weight to the opinions of Plaintiff's treating physicians after May 1, 2013.  [*Id*. at 14–15.]

The Commissioner, on the other hand, argues the ALJ properly considered all of the medical evidence in determining Plaintiff was not disabled after May 1, 2013. [Doc. 10 at 9.] The Commissioner also contends the ALJ properly discussed Dr. Menendez-Caldwell's August 2013 treatment notes and observed that Plaintiff's symptoms stemmed from the legal proceedings surrounding her son's death rather than from PTSD and depression, noting that Plaintiff's treatment remained conservative in nature. [*Id*. at 11.]

The Court agrees with Plaintiff that the ALJ failed to properly consider and weigh the August 2013 opinion of Dr. Menendez-Caldwell, Plaintiff's treating mental health provider. And, thus, the ALJ's decision is not supported by substantial evidence.

### Relevant Medical History

#### *Pre-May 2013*

Records from Carolina Center for Behavioral Health ("CCBH") beginning March 18, 2010, indicated Plaintiff unsuccessfully was trying to cope with grief after losing her 16-year-old son after he leaped from a moving ambulance onto I-85. [R. 334–36; *see also* R. 345.] Treatment notes from CCBH dated February 22, 2011, indicated Plaintiff was working part-time and was learning to deal with the loss of her son. [R. 333.] Plaintiff was also suing the ambulance company and hospital. [*Id*.] Notes from CCBH dated August 25, 2011, indicated Plaintiff "wound up" at work and had been drinking every day and that her boyfriend Jeremy was concerned about her drinking. [*Id*.] Plaintiff was described as forgetful, unable to concentrate, isolating herself and experiencing PTSD symptoms. [*Id*.] Clinical treatment notes dated October 6, 2011, indicated that Wellbutrin was "working great;" Plaintiff was working from 4–8 pm; and she had gone to the mountains with Jeremy

20

and that it "was an awesome get away." [R. 331.] Clinical notes also indicated that Plaintiff resigned from her job on November 1, 2011, and had not worked since that time. [*Id.*]

Plaintiff attended therapy at Family Therapy & Trauma Center ("FT&TC") from January 7, 2011, through September 30, 2011, and was diagnosed with major depressive disorder concurrent with severe PTSD and was being treated with Wellbutrin, Lexapro, Klonopin and Trazodone. [R. 339–40.]

Plaintiff participated in partial hospitalization at CCBH on November 9, 2011. [R. 318.] Plaintiff reported increased depression, anxiety, reliving and re-experiencing the news of her son's death. [*Id.*] She also reported a dramatic increase in her alcohol intake, up and down appetite, poor concentration, isolating behaviors, and several episodes of brief suicidal ideation (one of which her boyfriend stopped her from carrying out). [*Id.*] There was on-going litigation regarding her son's death, and Plaintiff reported having to give a deposition in the next couple weeks which had brought up stressful thoughts. [*Id.*] Due to her suicidal ideation and her inability to care for herself, it was recommended that Plaintiff be voluntarily stepped up to inpatient hospitalization; she agreed. [*Id.*] Plaintiff was discharged on November 17, 2011, and diagnosed with PTSD; major depressive disorder, recurrent and severe; alcohol dependence; GERD, loss of child, legal and occupational; and assessed a GAF score of 30. [R. 320.] Plaintiff's medications included Lexapro, Wellbutrin, Klonopin, Trazodone, Diptropan, Vivelle patch, and Prilosec. [R. 322.]

Plaintiff was admitted to CCBH on November 17, 2011, after unsuccessfully attempting partial hospitalization, due to decreased level of functioning, passive suicidal ideation, and excessive drinking. [R. 304.] Plaintiff had been in outpatient therapy with a family therapist for the past 20 months and also had seen Dr. Menendez-Caldwell as an

21

outpatient.  [R. 308.]  Plaintiff was reportedly living with her boyfriend and two other children; her boyfriend was extremely supportive; her youngest son, who was autistic, passed away in February 2009.  [*Id.*; R. 315.]  Plaintiff was initially assessed with alcohol dependence; PTSD; Major depressive disorder, recurrent, severe; and was assigned a GAF score of 25.  [R. 309.]  Plaintiff was treated with Lexapro, Wellbutrin, Remeron and Prazosine.  [*Id.*]

On November 21, 2011, Plaintiff was determined to be stable for discharge and was discharged from CCBH.  [R. 304.]  Plaintiff was to follow up with partial hospitalization on November 22, 2011, and was also to follow-up with her outpatient psychiatrist and therapist.  [R. 306.]  On discharge, Plaintiff was assessed with Major depressive disorder, severe and recurrent; PTSD; alcohol dependence; gastroesophageal reflux disease; and her GAF score was 45. [*Id.*]

On November 22, 2011, Plaintiff was admitted to CCBH on partial hospitalization due to "depression and alcohol."  [R. 311, 314.]  Plaintiff reported transitioning to home fairly well, but she still was feeling at times like she wanted to isolate, and she had been unable to participate in activities with her family. [*Id.*] She reported that her sleep had improved and she had fewer flashbacks and nightmares regarding the death of her late son.  [*Id.*]  Plaintiff's reported medications were Lexapro, Wellbutrin, Remeron, Klonopin, Trazodone, Prazosin, multivitamin, thiamin, and Tranxene. [R. 315.]  On November 25, 2011, Plaintiff reported increased nightmares and her Prazosin dose was increased at night.  [R. 311.]  Remeron was discontinued due to weight gain.  [*Id.*]  On admission, Plaintiff was diagnosed with alcohol dependence; major depressive disorder, recurrent, severe; PTSD; GERD; and assessed a GAF score of 46.

On November 29, 2011, Plaintiff complained of drowsiness and Klonopin was decreased and given at bedtime as needed for sleep.  [*Id*.]  On December 1, 2011, Plaintiff complained of decreased mood and Wellbutrin was eventually increased.  [*Id*.]  On December 7, 2011, Plaintiff admitted she had run out of medications at home and was unable to get Prazosin or Lexapro and had not been able to do this for several days; she failed to advise anyone in the program about this. [R. 311–12.]  Plaintiff was given a 28-day supply of Lexapro samples and another prescription of Prozosin.  [R. 312.]  Plaintiff was discharged on December 9, 2011; she was stable, not psychotic or manic; and was tolerating her medications without acute physical complaints.  [*Id*.]  Plaintiff was to follow up with Dr. Menendez-Caldwell as well as the IOP program at CCBH.  [R. 313.]  Plaintiff's prognosis was fair in that she was responding well to medications and to therapy but needed to remain compliant with both to continue to be sober.  [*Id*.]  Plaintiff was diagnosed with alcohol dependence, partial remission; major depressive disorder, recurrent, severe; PTSD; GERD; loss of child; and assessed a GAF score of 50.  [*Id*.]

Treatment notes also showed Plaintiff attended therapy at FT&TC on March 27, 2012, indicating she still had a lot of anxiety; that her mother bought her 3 months of tanning to get her out of the house; that her mother and father each took her out once a week; she was sleeping better but did not feel rested; she was doing more chores and her hygiene was improving; and that she had not been going to therapy due to lack of money. [R. 343.] Treatment notes indicated that Plaintiff needed therapy. [*Id*.]

On April 12, 2012, Plaintiff underwent a psychological evaluation by Dr. Bruce A. Kofoed, Ph.D. ("Dr. Kofoed") at the request of disability examiner Jaya Ratnam.  [*See* R. 345–48.]  Plaintiff reported depression, anxiety, panic and sleeplessness, as well as long

23

episodes of not bathing, frequent crying, staying in bed and drinking heavily. [R. 345.] She reported taking Clonazepam, Lorazepan, Trazodone, Omeprazole, bupropion, Prazosin and Vivelle; and reported feeling anxious at the thought of leaving home and had difficulty in large crowds. [*Id*.]   On mental examination, Dr. Kofoed noted Plaintiff's mood was depressed and anxious; and she was agitated and somewhat tremulous secondary to her anxiety level. [R. 346.] Dr. Kofoed found Plaintiff's effort on cognitive tasks to be appropriate; she was oriented in all spheres; she did serial seven subtractions rather slowly; learned a four-word list and recalled three directly and one with a multiple choice prompt; and copied geometric shapes and angles with good attention to detail, but showed rather poor recall even with substantial cuing. [R. 347.]   In light of these findings, Dr. Kofoed found that Plaintiff's would have difficulty with sustained concentration, especially if task complexity increased. [*Id*.]   Dr. Kofoed diagnosed Plaintiff with major depression, not otherwise specified; anxiety, not otherwise specified (consider possible PTSD; consider possible panic disorder, not otherwise specified); ongoing bereavement issues; and possible alcohol misuse. [R. 347–48.]   Dr. Kofoed noted Plaintiff appeared capable of making financial decisions on her own. [*Id*.]

Progress notes from Dr. Patricia Cheek ("Dr. Cheek") of the University Medical Group ("UMG") dated August 14, 2012, indicated Plaintiff had a "work in visit" with concerns about her visit to CCBH, gained weight, GERD, nasal congestion, and her need for a refill of Vivelle (menopause). [R. 350.] On August 22, 2012, Plaintiff was seen at FT&TC for her depression. [R. 355.]   Treatment notes indicated Plaintiff quit work in December 2011 because she could not handle the stress; depression sounded more serious; she had no motivation to leave the house, did not bathe for 3 or 4 days; stopped

24

doing bills, etc.  [*Id*.]  On mental status exam, present concerns were noted as mild depressed mood (situational about her son's death); moderate anxiety (situational about the legal process); chronic psychotraumatic stress; and personality change due to substance abuse.  [R. 356.] Plaintiff denied suicidal or homicidal ideation; her insight to present problems was good; and her confidence and self esteem were deflated.  [*Id*.] Treatment notes indicated Plaintiff was taking Wellbutrin, Lexapro, Trazodone, Prazosin, Klonopin, and Ativan. [*Id*.]

Clinical notes from Palmetto Child & Family Psychiatric ("PC&FP") dated August 28, 2012, indicated Plaintiff was seeing Dr. Chrys Harris ("Dr. Harris") for therapy and that her parents were paying for it.  [R. 353.]  Notes also indicated Plaintiff was unable to work due to crying spells, anxiety, inability to concentrate and an inability to leave home, and that she is financially stressed.  [*Id*.] Plaintiff indicated she had been denied disability twice and that she felt like a burden to so many people.  [*Id*.] Treatment notes indicated Lexapro was discontinued and that Plaintiff was asked to try Prozac and to continue with her other medications. [*Id*.]

A Progress Report from North Hills Medical Center ("North Hills") dated November 21, 2012, indicated Plaintiff was having problems with depression and anxiety.  [R. 357.] Her medications were listed as Desyrel, Wellbutrin, Prazosin, Prozac, Lorazepam, Omeprazole and Klonopin.  [R. 358.]  Plaintiff described her typical day as getting up around 10 and 12 noon after falling asleep around 12 or 1 a.m., waking up at 4 a.m., and trying to go back to sleep. [*Id*.] During the day, she tried to play with her dog and take him out; she talked to her mother; her boyfriend brought her dinner or her mother cooked for her; she did not like to drive and depended on others to take her to appointments; and

25

watched TV for fun. [*Id*.] Plaintiff typically stayed inside because she felt safe there; occasionally she would go to the grocery store for a short visit; socially she avoided crowds; and she would typically not answer the phone unless it was her mother or boyfriend calling.  [*Id*.] On mental status exam, Plaintiff was alert and oriented x3, appropriately attired and was in good contact with reality.  [*Id*.] Plaintiff admitted to being somewhat paranoid and having flash backs and intrusive thoughts about her son's death. [*Id*.] Plaintiff appeared depressed and anxious, cried frequently, had poor eye contact, talked in a low monotone voice, and there was obvious psychomotor retardation.  [R. 358–59.]   Plaintiff was diagnosed with major depressive disorder and PTSD, on-going bereavement issues, and she was assessed a GAF score of 40.  [R. 359.]

On November 26, 2012, Dr. Ann-Marie Menendez-Caldwell ("Dr. Menendez-Caldwell") completed a form asking for an assessment , based on her examination, of how Plaintiff's mental/emotional capabilities are effected by her impairments.  [R. 360–62.] Dr. Menendez-Caldwell provided the following assessment:

- In making <u>occupational adjustments</u>, Plaintiff's abilities are:

    Fair (*ability seriously limited but not precluded*) with respect to

    - following work rules
    - relating to co-workers
    - using judgment
    - interacting with supervisor
    - functioning independently

    Poor/None (*no useful ability to function*) with respect to

    - dealing with public
    - dealing with work stresses
    - maintaining attention and concentration

[*Id*.] The clinical findings supporting this assessment included depressed mood, crying spells, poor concentration, poor memory, and insomnia.  [*Id*.]

- In making <u>performance adjustments</u>, Plaintiff's abilities are:

  Fair (*ability seriously limited but not precluded*) with respect to performing

  - detailed, but not complex, job instructions
  - simple job instructions

  Poor/None (*no useful ability to function*) with respect to performing

  - complex job instructions

[R. 361.] The clinical findings supporting this assessment included poor concentration and attention, easily distracted, flashbacks, and panic attacks. [*Id*.]

- In making <u>personal-social adjustments</u>, Plaintiff's abilities are:

  Good (*ability to function in this area is limited but satisfactory*) with respect to

  - maintaining personal appearance

  Fair (*ability seriously limited but not precluded*) with respect to performing

  - relating predictability
  - demonstrating reliability

  Poor/None (*no useful ability to function*) with respect to

  - behaving in an emotionally stable manner

[R. 361.]  This assessment was based on Plaintiff's depressed mood, crying spells, and panic attacks. [*Id*.] Dr. Menendez-Caldwell also noted that these restrictions had persisted since October 2011, the date Plaintiff became disabled, and that Plaintiff was capable of managing benefits in her best interest.  [*Id*.]

27

Clinical notes dated December 13, 2012, indicated Plaintiff was "better this year than last year but still isolating–cannot go out, had not been out of the house x-8 days, had not bathed until today." [R. 364.] Plaintiff was noted to be very anxious, could not be in crowds, had no energy to cook or clean but was not sleeping; she waited for her boyfriend Jeremy to come home. [*Id*.] Plaintiff relayed that it was too much effort to take the dog out; she had not seen her therapist; but she was no longer drinking alcohol. [*Id*.] On mental status exam, Plaintiff was very sluggish and dysphoric and her psychomotor was retarded; she had good hygiene and grooming, but said it took her several hours to get herself ready. [*Id*.] Celexa was added to Plaintiff's medication regimen, and Wellbutrin was continued but there was discussion about stopping it and trying a stimulant like Concerta. [*Id*.] Clinical notes dated January 8, 2013, indicated a telephone call from Plaintiff relaying that Celexa was working well, anxiety was better, but Plaintiff was still sluggish in the mornings and had nightmares. [*Id*.] Plaintiff's dosage of Wellbutrin was reduced and Concerta was added; however a telephone call dated January 17, 2013, indicated that Concerta was too expensive; Plaintiff was then asked to try Ritalin. [*Id*.]

Treatment notes dated February 12, 2013, indicated Ritalin had helped Plaintiff physically to get things done; and had increased her focus; but, she thinks her mood had decreased since reducing her dosage of Wellbutrin. [R. 363.] Plaintiff reported that Celexa had helped with her panic and anxiety at night and that she was making progress with her grief. [*Id*.] Treatment notes dated April 9, 2013, indicated Plaintiff remarried Jeremy, her boyfriend and ex-husband, about three weeks prior and went to Myrtle Beach for her honeymoon. [*Id*.] She indicated she was doing better on Ritalin, was getting things done

and was more productive; she even drove to her appointment. [*Id*.] It was also noted that her PTSD was improving. [*Id*.]

A Progress Note from Greenville Health System dated April 23, 2013, by Dr. Cheek indicated Plaintiff was seen on follow up for her anxiety-depression/PTSD and that Plaintiff was being followed by psychiatrist Dr. Menendez-Caldwell. [R. 367.] Notes indicated that Plaintiff started on Ritalin and that it had helped her get "going in the morning" and get out of bed and focus on the day. [*Id*.] It was also noted that, for the last 3–4 months, Plaintiff had begun coming out of her severe depression and PTSD; she was feeling joy for the first time in a long time; she still grieved over her son and hoped that, once the litigation was over, she would be able to move forward; but, she still tended to be home-bound. [*Id*.] Progress note indicated that on neurological exam, Plaintiff was alert and oriented x3; nonfocal; CN 2-12 grossly intact; and gait normal. [R. 368.] Progress notes also show that on psychiatric exam, Plaintiff's mood and affect were appropriate; eye contact good; and she was articulate, smiling and had brighter affect. [*Id*.]

### *Post-May 2013*

On July 17, 2013, Dr. Harris with FT&TC wrote a letter to the Clerk of Court, Greenville County, asking that Plaintiff be excused from jury duty based on her use of a "substantial amount of psychotropic medication," excessive fears and lack of ability to function in a closed area with a multitude of people. [R. 376.] Plaintiff was excused from service. [R. 377.]

On August 14, 2013, Dr. Harris completed a "Summary of Services" form covering the period of August 22, 2012, through August 7, 2013, indicating that Plaintiff was presently in therapy; her emotional functionality was abnormal (anxious); and that she has

been experiencing complex bereavement for over three years due to her son's death and developed PTSD immediately following his death. [R. 371.] Plaintiff was assessed with a GAF score of 45.  [*Id*.]  Present concerns with respect to Plaintiff were noted to be severe anxiety; trauma and stress related disorder; sleeping and eating problems; legal problems, substance abuse; and past concerns of deflated confidence and self esteem; isolation with agoraphobia; concentration problems; distractibility and problems staying focused; thought process problems; labile emotionally; and short term memory impairment.  [R. 372.]  Dr. Harris also had assessed Plaintiff with severe PTSD/chronic, secondary to her son being killed and seeing him in the morgue. [R. 375.]

Clinical treatment notes dated August 20, 2013, noted that Plaintiff was feeling overwhelmed and stressed after giving a deposition at the end of June, upcoming disability hearing, and mediation in her son's case in September.  [R. 383.] Plaintiff reported feeling re-traumatized, like she was on trial.  [*Id*.] On mental status exam, Plaintiff appeared with no make-up, depressed psychomotor, tearful, depressed, overwhelmed, hopeless, helpless, and soft spoken.  [*Id*.] She reported experiencing low energy, low motivation, depressed mood, crying spells, nightmares, insomnia, anxiety and panic attacks; she was not doing as well as she was at her last appointment.  [*Id*.] Dr. Menendez-Caldwell continued Plaintiff on her current medicines and increased her frequency of therapy.  [*Id*.]

On August 22, 2013, Dr. Menendez-Caldwell completed a questionnaire opining regarding Plaintiff's ability to do work-related activities on a day-to-day basis in a regular work setting and providing the following assessment:

> • Plaintiff's particular medical or clinical findings include: deterioration in grooming, depressed psychomotor, tearful, depressed mood, nightmares and insomnia;

- Plaintiff's ability to make <u>occupational</u> adjustments can be described as:

  Fair (*ability seriously limited but not precluded*) with respect to

  - following work rules

  Poor/None (*no useful ability to function*) with respect to

  - relating to co-workers
  - dealing with the public
  - using judgment
  - interacting with supervisor
  - dealing with work stresses
  - functioning independently
  - maintaining attention/concentration

[R. 380.]  The limitations supporting this assessment included crying spells, flashbacks, depressed mood, panic attacks, and insomnia. [*Id.*]

- Plaintiff's ability to make <u>performance</u> adjustments can be described as:

  Poor/None (*no useful ability to function*) with respect to

  - complex job instructions
  - detailed, but not complex, job instructions
  - simple job instructions

[R. 381.]  The limitations supporting this assessment included poor concentration, easily distracted, preoccupied by feelings of helplessness, depression, poor memory and low energy. [*Id.*]

- Plaintiff's ability to make <u>personal-social</u> adjustments can be described as:

  Fair (*ability seriously limited but not precluded*) with respect to performing

  - maintaining personal appearance

  Poor/None (*no useful ability to function*) with respect to

  - behaving in an emotionally stable manner
  - relating predictability

31

- demonstrating reliability

[*Id*.] Dr. Menendez-Caldwell indicated these restrictions had persisted since October 2011, and the limitations supporting her assessment included Plaintiff being easily overwhelmed by everyday tasks and her avoiding leaving home due to anxiety and panic attacks. [*Id*.] Dr. Menendez-Caldwell also noted that she had known Plaintiff for approximately 12 years and treated her son Ryan who died tragically in February 2010. [*Id*.] Dr. Menendez-Caldwell noted that, prior to her son's death, Plaintiff was high functioning, very capable, and a hard working nurse and mother; now she was so impaired by grief that she could barely take care of herself.   [*Id*.]   Dr. Menendez-Caldwell concluded that Plaintiff was currently unable to work in any capacity, but is able to manage benefits in her best interest. [R. 381–82.]

### ALJ's Consideration of Dr. Menendez-Caldwell's Opinion Evidence

Prior to May 2013, the ALJ found Plaintiff was disabled because, due to her mental impairments,  she was unable to engage in sustained work activity for a full 8-hour workday on a regular and consistent basis and would miss more than 3 days of work per month and be off task up to 30% of the workday.  [R. 113, Finding 5.]   Specifically, the ALJ explained that

> The overall weight of the evidence of record supports finding that the claimant could not maintain appropriate on-task behavior or attendance in a workplace setting from October 4, 2011 through May 1, 2013.   The claimant consistently participated in mental health treatment between March 2010 and April 2013. These treatment records confirm that she attempted to return to work after her son's death in February 2010 but ultimately had to leave work in October 2011 due to the severity of her symptoms. During 2010, the claimant reported crying tantrums that would last between 30 minutes to 1 hour and appeared tearful and dysphoric in her treatment

32

sessions (2F/6-7). While she did appear to make some progress in her recovery in early 2011, the claimant deteriorated again in mid-2011, with her records noting six months of isolating behavior, memory difficulties, insomnia, crying spells, and PTSD symptoms. The claimant also began drinking more as a form of stress relief (2F/3-4). In November 2011, the claimant sought treatment through a partial hospitalization program due to a suicide attempt and ultimately had to be admitted to an inpatient program for 5 days after she failed to follow-up with the partial hospitalization program. The claimant needed to be admitted due to an inability to reduce her alcohol consumption without an inpatient admission. After being discharged from her inpatient program, the claimant participated in another partial hospitalization program for approximately two weeks (1F/2-4, 9-10, 16-18). While the claimant's partial hospitalization program did stabilize her symptoms, later treatment records would confirm that she continued to struggle with intense PTSD and depressive symptoms that would prevent her from maintaining full-time work.

During 2012, the claimant engaged in regular mental health treatment and her treatment records make consistent references to isolating behavior, sleeping difficulties, difficulties focusing or concentrating, and difficulties leaving the house or being around other people (2F; 3F; 4F; 7F; 8F; 9F; 11F). While the claimant did report being able to go grocery shopping for the first time in a long time in January 2012, adding that she felt like she was doing better at that appointment, the vast majority of her appointments show an individual who struggles with even basic daily tasks due to her PTSD and depression (2F/2). For example, in March the claimant reported an inability to concentrate, crying spells, and a lot of anxiety (4F). In August, the claimant reported that she cannot leave the house without anxiety, difficulty being around others, and appeared tearful and dysphoric (7F). Again, she appeared to improve somewhat in October only to deteriorate in November, when her treating provider assigned her a Global Assessment of Functioning, ("GAF"), score of 40, indicating major impairment in several functional areas (9F; 11F/3). Finally, in December, despite reporting some improvement in the past year, the claimant still noted she isolates, cannot leave her house, and only engages in limited bathing or grooming. In addition, her mental status examination at this appointment noted that she appeared very sluggish, dysphoric,

33

>and displayed psychomotor retardation (11F/2). Overall, despite some periods of brief improvement, the claimant's symptoms during this period remained consistent and support finding that she could not maintain appropriate persistence or attendance in a workplace setting due to her isolating behavior, crying spells, lack of energy, and difficulty focusing.

[R. 114–15.]

The ALJ then determined that Plaintiff's symptoms began to improve in early 2013 after her medication was adjusted to include Ritalin. [R. 115.] The ALJ explained as follows:

>In January 2013, the claimant reported that Celexa worked well and improved her anxiety (though she still felt sluggish in the morning) (11F/2). In February, while the claimant reported variable sleep and dreams where she relives her past trauma, she also reported that Ritalin helps her get things done physically with improved focus (11F/1). She still reported a depressed mood despite medication but continued to report improved panic and anxiety symptoms. She also reported making progress with her grief. By April, the claimant reported that she felt so much better on Ritalin. This medication allowed her to get things done, be more productive, and obtain more sleep. While she still suffered from nightmares, at this examination she appeared well-groomed, maintained good eye contact, and noted that her PTSD was improving (11F/1). Even her primary care provider noted that over the last three to four months the claimant was beginning to come out of her severe depression and PTSD, with the claimant stating that she felt joy for the first time in a long time. While she still tends to be homebound, she told her primary care provider that she hoped that once the litigation surrounding her son's death was over she would be better able to move forward (12F).
>
>After April 2013, the claimant engaged in no documented treatment for her mental impairments until August. As will be explained within Finding 17, the claimant's improvement in her symptoms in April 2013, combined with her lack of documented treatment, support finding that her impairments improved to the point where she could maintain appropriate attendance and on task behavior in a workplace setting as of May 1, 2013. While the claimant's improvement in her

symptoms actually occurred during April, I find that it is reasonable to establish that the claimant's symptoms improved to the point where she could return to work on May 1, 2013, to correspond with the end of her documented regular treatment.

When making this determination, I gave great weight to an opinion provided by Ann-Marie Melendez-Caldwell, M.D., in November 2012, the claimant's treating mental health provider since early 2010.[8]  Based on her treatment with the claimant, Dr. Melendez opined that the claimant had no useful ability to function in the following areas: dealing with the public; dealing with work stress; dealing with complex job instructions; and behaving in an emotionally stable manner.  The remainder of the claimant's abilities were seriously limited but no precluded in an employment setting. This opinion is consistent with the overall weight of the evidence of record prior to May 1, 2013, which outlines an ongoing struggle with PTSD and depressive symptoms, resulting in chronic isolating behavior, crying spells, anhedonia, difficulty focusing, and difficulty with memory (10F).

[R. 115–16.]

The ALJ explained that, while Plaintiff's alleged symptoms and limitations as of May 2, 2013, remained the same as outlined in Finding 5, the overall weight of the evidence of record supported finding that the claimant's mental impairments improved to the point where she could maintain the persistence and attendance required for full-time work within the confines of the residual functional capacity. [R. 120.]

With respect to the ALJ's weighing of Dr. Menendez-Caldwell's August 2013 opinion, the ALJ explained that the opinion was worthy of little weight because it represented

a dramatic deterioration in the claimant's symptoms from Dr. Caldwell's November 2012 opinion.  I did not find this opinion persuasive because this dramatic deterioration is not supported by the evidence of record. The claimant's treatment

---

[8]In the ALJ's decision, it appears that he mis-spelled Dr. Menendez-Caldwell's name.

35

records actually note that the claimant's symptoms improved from January through April 2013. After April 2013, the claimant engaged in minimal mental health treatment, despite the fact that she now had medical insurance. Furthermore, the claimant's treatment, including her medications, did not change significantly from April 2013 to August 2013. Even Dr. Caldwell did not increase the claimant's [*sp*] medications in response to her alleged increased symptoms. Therefore, I find that this opinion is inconsistent with the overall weight of the evidence of record and gave it little weight (13F; 15F).

[R. 122–23.]

**Discussion**

The responsibility for weighing evidence falls on the Commissioner or the ALJ, not the reviewing court. *See Craig*, 76 F.3d at 589; *Laws*, 368 F.2d at 642; *Snyder*, 307 F.2d at 520. The ALJ is obligated to evaluate and weigh medical opinions "pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir.2005) (citing 20 C.F.R. § 404.1527). ALJs typically "accord 'greater weight to the testimony of a treating physician' because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Id*. (*quoting Mastro*, 270 F.3d at 178). While the ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, *Craig*, 76 F.3d at 590, the ALJ must still weigh the medical opinion based on the factors listed in 20 C.F.R. § 416.927(c). Additionally, SSR 96–2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory

36

> diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

1996 WL 374188, at *4 (July 2, 1996).

Upon review, the Court notes that Dr. Menendez-Caldwell's August 2013 opinion regarding Plaintiff's ability to perform work-related activities was more descriptive than her November 2012 opinion. For example, although both opinions were on the same form Dr. Menendez-Caldwell wrote more details in her own hand-writing on the August 2013 opinion.[9] [*Compare* R. 360–62 *with* R. 380–82.] The August 2013 opinion stated that Plaintiff was more limited in her abilities to perform work-related activities than as described in the November 2012 opinion and that her limitations had existed since October 2011. [R. 380–82.] Dr. Menendez-Caldwell stated that her medical opinion was based on her findings that Plaintiff had tearful, depressed mood, nightmares, insomnia, deterioration in grooming, and depressed psychomotor, and that Plaintiff was so impaired by her grief she could barely take care of herself. [*Id.*] As explained above, the ALJ gave great weight to Dr. Menendez-Caldwell's November 2012 opinion only as it applied to the time period prior to

---

[9]The Commissioner argues that Dr. Menendez-Caldwell's August 2013 opinion was a check-the-box style of form so it was weak evidence. [Doc. 10 at 15.] While courts have held that a check-the-box type of form without explanatory comments are not entitled to great weight, such is not the case here. *See Wright v. Astrue*, C/A No. 2:14-1999-TLW, 2015 WL 5036948, at n.1 (D.S.C. Aug. 26, 2015). Here, the doctor wrote several different explanatory comments on several different parts of the form.

May 2013.  But, the ALJ gave little weight to Dr. Menendez-Caldwell's August 2013 opinion.

In giving Dr. Menendez-Caldwell's August 2013 opinion only little weight, the ALJ failed to address his consideration of any of the factors outlined in 20 C.F.R. § 404.1527, including but not limited to, that fact that Dr. Menendez-Caldwell had known Plaintiff for more than 12 years and was a specialist in the area of psychiatry.  The ALJ also failed to point to any medical evidence of record contradicting Dr. Menendez-Caldwell's findings, and failed to identify the medical evidence supporting his conclusion that Plaintiff now had the ability to engage in sustained work activity for a full 8-hour day on a regular and consistent basis, would not miss more than 3 days of work per month and would not be off task up to 30% of the workday (his basis for finding disability originally).  To the contrary, the ALJ discounted Dr. Menendez-Caldwell's opinion, as well as August 2013 evidence of record by Dr. Harris consistent with Dr. Menendez-Caldwell's findings, based on Plaintiff's "lack of consistent treatment" which, as explained below, is not supported by substantial evidence.

With respect to the ALJ's finding that Plaintiff failed to seek consistent treatment for her mental impairments, the Court notes that the ALJ's finding that Plaintiff "engaged in no documented treatment for her mental impairments [after April 2013] until August [2013]" does not appear to accurately reflect the evidence of record.  As an initial matter, treatment notes from FT&TC indicate that Plaintiff was seen for therapy (as needed) between August 22, 2012, and August 7, 2013.  [R. 371.]  Second, and curiously absent from the decision, is any discussion on Plaintiff's inability to receive or seek treatment due to her financial constraints.  Prior to her marriage, treatment notes indicated Plaintiff went

38

at times without therapy because she lacked the money to pay for therapy. [*See* R. 343.] When the ALJ asked Plaintiff about why she stopped getting regular counseling after she married, Plaintiff testified that, if she was not seeing her counselors, it was because she did not have any money to see them. [R. 30.] Prior to that time, her parents were paying her bills and helping her to get medication when they could because she and Jeremy could not afford it. [R. 31.]

The Fourth Circuit has found that a claimant "may not be penalized for failing to seek treatment she cannot afford." *Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1986). As a result, an ALJ should not discount a claimant's subjective complaints on the basis of her failure to seek medical treatment when she has asserted—and the record does not contradict—that she could not afford such treatment. *Id.; see also* 20 C.F.R. §§ 404.1530(a),(b), 416.930(a),(b); SSR 96–7p ("[T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure."). In his otherwise thorough opinion, the ALJ did not include specific factual findings regarding the resources available to Plaintiff and whether her failure to seek additional medical treatment was based upon her alleged inability to pay. The ALJ merely discounted Plaintiff's credibility of alleged worsening symptoms after April 2013 based on the fact she did not receive consistent treatment although she had health insurance, with no consideration of her claim that they simply could not afford it. [R. 121.] That fact that a person has health insurance does not automatically equate to an ability to pay for treatment (for example, co-pays, deductibles, and coverage issues).

Additionally, the ALJ relied on Plaintiff's statements to several providers that she was feeling better, that she had gotten married and gone on a honeymoon trip, and that her medications did not change significantly from April 2013 to August 2013 as reasons to discount Dr. Menendez-Caldwell's August 2013 opinion.  Substantial evidence in the record does not support this.  Dr. Menendez-Caldwell's August 20, 2013, treatment notes indicated that the doctor instructed Plaintiff to increase the frequency of therapy, that Plaintiff felt overwhelmed, stressed, depressed mood, crying spells, nightmares, insomnia, anxiety and panic attacks, and she was not doing as well as her last appointment.  These treatment notes supported her August 2013 medical opinion.  Thus, even if Plaintiff told several providers she was doing better in early 2013 and got married and went on a trip, that does not equate to medical improvement as of May 2, 2013, such that Plaintiff could perform a full-time job, especially when her mental health condition worsened again in August 2013 as documented by Dr. Menendez-Caldwell.

As noted, Dr. Menendez-Caldwell instructed Plaintiff to increase the frequency of therapy in August 2013 and continue on the current medicines.  The ALJ found that Dr. Menendez-Caldwell's continuing Plaintiff on current medicines instead of increasing Plaintiff's medicines was a reason to discount the August 2013 opinion.  This comment by the ALJ seems to improperly substitute his medical opinion for that of Dr. Menendez-Caldwell. *See Vowels v. Colvin*, C/A No. 8:14-1138-DCN, 2015 WL 5546701, at *3 (D.S.C. Sept. 18, 2015) (explaining that an ALJ may not substitute expertise he did not possess in medicine for the opinion of an examining physician that was uncontradicted).

For all of these reasons, the Court cannot find that the ALJ's weighing of Dr. Menendez-Caldwell's August 2013 opinion is supported by substantial evidence.  On

40

remand, the ALJ should specifically address the factors outlined in 20 C.F.R. § 404.1527 in weighing the opinion of Plaintiff's treating physician. The ALJ should also explain how the fact that Plaintiff's treating physician decided to increase her frequency of therapy rather than increase her medication dosage weighs against a finding that Plaintiff is limited in the manner outlined in Dr. Menendez-Caldwell's August 2013 opinion. The Court notes that the record shows that Plaintiff was on numerous medications consistently since the time of her son's death with very few adjustments in dosage.  A general discussion of activities, as the ALJ provided, and an ALJ's intuition are not sufficient to overcome medical evidence. *See Young v. Bowen*, 858 F.2d 951(4th Cir.1988) ("Absent contrary medical evidence, the Secretary lacked any basis to reject the competent judgment of a concededly  reliable expert.").  The ALJ should also outline the evidence of record supporting his finding that Plaintiff now has the ability to engage in sustained work activity in light of the medical evidence to the contrary; and should make factual findings regarding Plaintiff's financial situation and its impact on her ability to seek medical treatment. To the extent that the ALJ continues to find that Plaintiff's lack of medical treatment lessens her credibility, the ALJ should refer specifically to the evidence that informs his conclusions, taking care that he does not penalize Plaintiff for failing to seek treatment she could not afford.

**Remaining Allegations of Error**

Because the Court has determined that remand is necessary to properly weigh the opinion of Plaintiff's treating physician, the Court declines to address Plaintiff's additional allegations of error by the ALJ.  On remand, however, the ALJ should take into consideration Plaintiff's remaining arguments.

## CONCLUSION AND RECOMMENDATION

Based upon the foregoing, it is recommended that the decision of the Commissioner be REVERSED and REMANDED for administrative action consistent with this recommendation, pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO RECOMMENDED.


July 8, 2016                           s/Jacquelyn D. Austin
Greenville, South Carolina             United States Magistrate Judge